**Wilfredo Mejia ALVAREZ, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

No. 91 Civ. 6299 (CSH).

United States District Court,
S.D. New York.

Dec. 15, 1992.

Otto Obermaier, U.S. Atty., S.D.N.Y. (Dietrich L. Snell, Asst. U.S. Atty., of counsel), New York City, for U.S.

Leonard F. Joy, The Legal Aid Society, Federal Defender Services Unit (Marjorie M. Smith, The Legal Aid Society, of coun-

sel), New York City, for Wilfredo Mejia Alvarez.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This case is before the Court on petitioner's request for habeas corpus relief pursuant to 28 U.S.C. § 2255, and for a new trial pursuant to Rule 33, Fed.R.Crim.P.

## BACKGROUND

On March 9, 1989, Wilfredo Mejia Alvarez was indicted along with four other defendants—Luis Susana, Juan Carlos Galan, Juan Morales, and Jaime Suarez—for violating the narcotics laws of the United States. Indictment 89 Cr. 198 ("Indictment").

Count one of the Indictment charged Alvarez and his four co-defendants with conspiracy to possess five kilograms or more of cocaine with the intent to distribute. *Id.* Count two charged Alvarez and the four others with possession of five kilograms or more of cocaine with the intent to distribute. *Id.* Counts three and four charged only Susana with felony counts pertaining to possession of a firearm. *Id.*

Galan, Morales and Suarez pled guilty prior to trial. Alvarez and Susana were tried jointly before the Honorable Dominick L. DiCarlo,[1] beginning on July 18, 1989. After a four-day trial, the jury returned verdicts of guilty on both counts against Alvarez, and on all four counts against Susana.[2] On November 28, 1989, Alvarez was sentenced to ten years in prison and five years of supervised release. He is currently serving that sentence.

Alvarez's instant motions challenge the fairness of his trial in light of events that occurred after his trial. Accordingly, what follows is an extensive discussion of the trial itself, and the pertinent events that followed.

---

1. Judge of the United States Court of International Trade, sitting by designation. I transferred the case to Judge DiCarlo for trial purposes.

2. Because the motion now before the Court was made by Alvarez, I will discuss Susana's case only where it is relevant to Alvarez.

*The Trial*

The prosecution's case against Alvarez centered on the testimony of a Confidential Informant ("CI"), Jose Freddie Diaz. As the first witness called by the government, Diaz described the circumstances of the Drug Enforcement Agency ("DEA") sting operation that led to Alvarez's arrest.

Diaz worked with a unit of the DEA known as Group 33. *United States v. Alvarez*, Trial Transcript ("*Alvarez* Tr.") at 70. He testified that on February 27, 1989, he entered a grocery store on 124th Street and Amsterdam Avenue in Manhattan to arrange a drug transaction with the owner, a reputed drug dealer. *Id.* at 35. Although Diaz spoke with the store owner that day, he made only preliminary inquiries. *Id.* at 36. He returned the next day, February 28, during "afternoon hours," *id.* at 37, and later arranged to purchase three kilograms of cocaine at $16,000 to $17,000 per kilogram. *Id.* at 36–38. Defendant Juan Morales, apparently in collaboration with the owner of the store, suggested to Diaz that if the deal was going to take place, Diaz needed to drive with Morales to 172nd Street and Fort Washington Avenue in Upper Manhattan. *Id.* at 40. Morales and Diaz then drove to that location, where they met three men: defendants Juan Carlos Galan, Jaime Suarez, and Luis Susana. *Id.* at 41, 180–81.

The five men discussed the quality and price of the drugs. *Id.* at 41. Diaz was told that if he wanted the cocaine, he would have to go to the Bronx to get it. *Id.* at 42. He then drove with Morales to a Mobil gas station on Rosedale Avenue in the Bronx; Galan, Suarez, and Susana followed in a car behind them. *Id.* at 42–43. Diaz parked his car at the station and entered the other car. He then drove with Morales, Galan, and Suarez to the two-story, two-family home where Galan lived on Taylor Avenue, several blocks away.[3] *Id.* at 45–46, 186. They parked in a lot behind the house. *Id.* at 45.

Diaz testified that the four men entered Galan's second-story apartment and walked into the dining room area of the kitchen, where Susana was sitting down. *Id.* at 46–48. With Diaz and each defendant present except Alvarez, Susana placed three bricks of cocaine on the table. *Id.* at 48. Diaz inspected the cocaine by placing some on his tongue. *Id.* at 50. In keeping with the DEA plan for making arrests, Diaz then said he needed to return to his car to retrieve his money. *Id.*

Diaz testified that he asked if somebody could drive him back to the Mobil station, but that he was told "no, you have to walk back." *Id.* Diaz then allegedly asked if someone could at least accompany him, since he did not know the area and might get lost. *Id.* at 51. Galan responded to this question by calling Alvarez, who was in another room, and instructed him to accompany Diaz to his car.[4] *Id.*

Diaz and Alvarez left the apartment together. On their walk to the gas station, according to Diaz's testimony, Alvarez made several comments about the cocaine business. Because of its importance to the case against Alvarez, I now reproduce in full Diaz's testimony on this point, from the time Diaz began describing the conversation to the close of the prosecution's direct examination:

Q. After you left the apartment with Mr. Alvarez, what did you do?

A. Well, I started asking him questions. Would the drugs be there when I get back the money.

Q. When you asked him would the drugs be there when you got back with the money, what did he respond?

A. He said, "look, we ain't kind [sic—should read "kids"], we don't play around like that. It's going to be there. As long as you got the money, it's going to be there."

Q. Did you ask him anything else?

---

**3.** Susana apparently went ahead to Galan's house, where he waited for the others to arrive. *Alvarez* Tr. at 45–47, 186–87.

**4.** Diaz testified that Susana, not Galan, summoned Alvarez. Tr. at 51–52. Later in the trial, however, the government conceded that Diaz "made a mistake" on this point, and that Galan called Alvarez. *Id.* at 481.

A. To this moment right now, I can't recall.

Q. Did you ask him anything about the walking versus riding to the Mobil station?

A. Yeah. I asked him why couldn't they give me, you know, why can't somebody drive me over to where my car was. He says "look, this is the first time you are buying from us. Today we sold more kilos than we ever sold any other day. So this guy is kind of shaky, that's why he prefers you walking than driving over there."

[MR. LEADER—ATTORNEY FOR ALVAREZ]: Objection, your Honor. "This guy is kind of shaky"—

THE COURT: Did he tell you to whom he was talking.

DIAZ: Yes, he indicated to his boss—
. . . .

THE COURT: Without "the boss," did he indicate who he is talking about, being shaky? Did he say "my boss?"
. . . .

Don't give us what you thought yourself. Just what was said to you. He said his boss told him to do it?

A. Yes.

THE COURT: To the best of your recollection, he didn't identify who his boss was.

A. No.

Q. While you were having this conversation with Mr. Alvarez, what were you doing?

A. We were walking towards the gas station.

Q. As you approached the gas station, was this the same gas station where you had been previously?

A. Yes.

Q. As you approached the gas station, did he say anything to you?

A. He said, if I would have known that the gas station was here, I would have showed you another short cut.

Q. When you got to the Mobil gas station, what did you do?

A. I gave the arrest signal.

Q. What was the arrest signal?

A. I had a baseball cap on. I took off my cap and that was the signal.

Q. What happened at that time?

A. I remember DEA agent John Wilson and John Buchanan came up to the scene and arrested the gentleman over there.

THE COURT: Which gentleman?

A. The one with the light green, beige—

MR. LEADER: Stipulated Mr. Alvarez.

THE COURT: You may refer to him as Mr. Alvarez. He's been identified as Mr. Alvarez.

[MS. GRAY—ATTORNEY FOR GOVERNMENT]: Your Honor, at this time I have no further questions of the witness.

*Id.* at 53–56.

During cross-examination, counsel for Alvarez, Howard Leader, Esq., attempted to impeach Diaz's credibility. Leader questioned Diaz about his prior criminal record and about numerous benefits he had received for his cooperation with the DEA. He asked Diaz about his prior convictions for dealing in drugs, about receiving jail time for failure to appear as a criminal defendant, about accusations against him of felonious assault, and about his failure to file tax returns for monies earned as a CI. *Id.* at 64–98. Leader also asked about the amount of compensation Diaz received from the DEA, about whether the government reduced Diaz's jail time in return for cooperation, and about whether Diaz's cooperation would allow him to avoid deportation. *Id.*

The government's second witness was Special Agent James Hunt of the DEA. A Group 33 agent, Hunt was on surveillance duty during the evening of February 28, 1989 and testified that he followed Diaz from the grocery store on 124th Street and Amsterdam Avenue to the Mobil station in the Bronx. *Id.* at 125–29. Hunt watched as Diaz parked his car and as Diaz and Morales entered Galan's car. *Id.* at 129. He then followed Galan, Morales, Suarez, and Diaz as they drove to Galan's apartment, and observed them enter Galan's building at 1224 Taylor Avenue. *Id.* at 130.

Hunt testified that while waiting in the back of the building, he observed Alvarez and Diaz leave the building. *Id.* at 132. He followed as the two of them walked to the Mobil station. In response to questions from the prosecutor, Hunt denied that Diaz and Alvarez stopped and made a purchase at a grocery store on their walk to the gas station. *Id.* Hunt testified that after they arrived at the station, Diaz gave the prearranged signal and Alvarez was arrested. *Id.*

Hunt then proceeded to Galan's apartment where he and other DEA agents arrested Alvarez's co-defendants. Hunt stated that he recovered from the apartment eight kilograms of cocaine, a handgun, and $8,525 from the top of a dresser in the front bedroom. Two kilograms of cocaine were found outside the apartment after Galan apparently threw them out the window. *Id.* at 133–46.

After a DEA chemist testified that the cocaine was genuine, the prosecution called Juan Morales. Morales testified that he helped arrange the meeting at 172nd Street and Fort Washington Avenue among Diaz, Suarez, Susana, Galan and himself to discuss the drug sale. *Id.* at 180–81. At this meeting, the men agreed to meet at the Mobil station and then go to Galan's home. *Id.* at 182.

According to Morales, the five men eventually met in Galan's kitchen. *Id.* at 187. Diaz sampled the cocaine and indicated that he approved. *Id.* at 188–89. When Galan asked Diaz where his money was, though, Diaz said he did not have it. *Id.* at 189. Morales stated that after Susana said he would not accompany Diaz to the gas station, Galan called Alvarez. *Id.* at 189–90. When Alvarez came in to the room, this was the first time Morales had ever seen him. *Id.* at 190. Morales heard Galan tell Alvarez to go with Diaz to the gas station. Morales watched Diaz and Alvarez leave the apartment together. *Id.* at 190–91. The only other testimony Morales gave concerning Alvarez was that in the two months following their arrest, Alvarez told Morales that he had been staying at Galan's home for approximately 20 days before his arrest. *Id.* at 197–98.

The government next called DEA agent David Toracinta. Toracinta testified about the circumstances of Susana's arrest. He described how Susana pointed a gun at Toracinta when the agent entered the living room, and that Susana dropped his weapon as instructed by Toracinta. *Id.* at 222. Toracinta then handcuffed Susana, retrieved the pistol, and removed the four rounds of ammunition. *Id.* at 223, 242.

After a firearms expert testified about the gun, the government rested. *Id.* at 250–56.

At this point counsel for Alvarez moved for judgment of acquittal pursuant to Rule 29, Fed.R.Crim.P. The following colloquy occurred:

THE COURT: Any motions?

MR. LEADER: Yes. On behalf of Mr. Alvarez I make a motion pursuant to Rule 29 A for a judgment of acquittal in his behalf.

THE COURT: Count 1 and 2.

MR. LEADER: And specifically with respect to Count 2, that the charges I think are possession, I don't think there's been any evidence to suggest either actual or constructive possession on his part.

THE COURT: Counsel, what evidence do you have on the record to show constructive possession since there is no claim of possession?

MS. GRAY: Your Honor, the evidence in the record is that he was in the apartment on that day at the time the kilograms were being shown to the confidential informant. And at the time he left the apartment and walked with the confidential informant, he made reference to the fact that the cocaine would still be there when the buyer got back to the apartment.

And he also made reference to the fact that they had done a lot of business that day, so he has knowledge of the cocaine in the apartment and its presence there, and there is evidence that he is working in concert with Galan and with Susana and with the other people involved.

. . . .

THE COURT: The aiding and abetting rules don't require constructive possession. The motions are denied....

*Id.* at 256–58.

Alvarez then took the stand in his own behalf. He testified that Galan was his boss, whom he had been working for at an auto shop, Jerome Autoland, for 48 days prior to his arrest. *Id.* at 263. Alvarez had obtained this job on the recommendation of a friend of Alvarez's from Puerto Rico, Carlos Gonzalez. *Id.* at 263–64. Alvarez lived with Gonzalez in Far Rockaway until January 30, 1989, when Gonzalez and his wife moved to Massachusetts. *Id.* at 264–65.

Alvarez described at trial the circumstances leading to his moving in with Galan, stating that he looked for a place to live after he learned that the Gonzalez' were leaving New York. He testified that on January 24 he had seen a sign advertising rooms for rent. *Id.* at 265. He asked the person who advertised the rooms to call him at the auto shop, and he later told the auto shop secretary that he expected this telephone call. Galan overheard Alvarez's conversation with the secretary, and offered him a room in his apartment until Alvarez found a more permanent residence. *Id.* Alvarez accepted the offer and moved in on January 30. He brought no furniture—just his suitcase—and took the front bedroom. *Id.* at 266–67. He shared the apartment with Galan, Galan's wife and Galan's son. He did not pay rent. *Id.* at 295, 309.

When asked about the night he was arrested, Alvarez stated that he left work at about 5:00 p.m. *Id.* at 267. He did not go directly to Galan's apartment because Galan had told him that he was going to take his wife to dinner. When Galan was preparing to leave the auto shop at around 3:30 or 4:00 p.m., he stopped his car and honked his horn. *Id.* at 267–68, 302. Alvarez described their conversation:

A. I said to him "yes?" And he said "here, take this $5 so that when they close you can go to the movies."

Q. Did you have a set of keys to the apartment at this time?

A. No, sir.

Q. What happened next?

A. Then he said to me so that I wouldn't be waiting at home just in case he didn't arrive, he didn't want me to be outside in the cold.

*Id.* at 268.

Alvarez testified that he did not actually go to the movie; he went to 42nd Street to watch videos instead. *Id.* at 303. He then went to Galan's apartment at about 8:00 and saw Galan, Diaz and Suarez. *Id.* at 269. He had never seen the latter two men before. *Id.* Alvarez said that the three men were standing at the entrance to the kitchen. *Id.* at 270. Alvarez proceeded to the living room to watch television. *Id.* As he was about to take his coat off, Galan said to him, "please don't take your coat off. I want you to go down to the corner with this man." *Id.* Alvarez stated that there was a grocery store on the corner. *Id.* at 271. As he and Diaz walked down the stairs together, Alvarez heard Galan say to Diaz "bring back a couple of beers, too." *Id.*

At this point in the trial, Alvarez's testimony completely contradicts that of Diaz:

Q. On your way over to the grocery store, did you have any conversation with Mr. Diaz?

A. Yes, sir.

Q. Could you please tell us about that?

A. He said "I have got to get rid of this car. That car that I have is giving me too many problems."

Q. What else?

A. He said it's really a cold night, and I said, yes, my fingers are really frozen. And he said to me "do you live around here?"

And I said "yes, I have been living here for about a month. And I work at the shop with Mr. Galan."

He said to me "where you coming from now?"

I said "I'm coming back from 42[nd] Street."

Q. When you got to the grocery store, did anything happen there?

A. Yes. He bought some juice. I don't know exactly what kind. And when I saw that he paid for it I said to him "but he said to bring some beer."

Q. When you said he said to bring some beer, who were you referring to?

A. I was referring to the fact that Mr. Galan had said for him to bring back some beer.

Q. And what did he say to that?

A. He said "we will buy it a little bit later. Let's go out and see a car that I left parked out there so that I can check that it has not been stolen."

Q. Did he tell you where he had parked his car?

A. No, sir.

Q. Did he stop to look for his car?

A. Yes. But he kept taking me on the opposite side of where the car was, and I said to him "well, where did you leave that car?"

He said "I left it around here."

And I said to him "why did you leave it so far away," and he said "there wasn't a parking place around here."

Q. How far did you go, as best as you can remember?

A. It was quite some distance. It was like a half circle.

Q. You mean a half circle from 1224 Taylor Avenue to where his car was parked?

A. Yes. We did a 180 degree angle.

Q. When you realized you will come all the way around in a semi circle, did you say anything to him about that?

A. Yes. I said "how is it you don't know where you left your car?"

And he said "I left it at the gas station." I said "well, the only one that I know is the one that is down there."

He said "well, maybe that's it. Let's go down there."

Q. So you went there, right?

A. Yes.

Q. And as you walked over to the gas station, the two of you continued talking together?

A. Yes.

Q. Without going into the specific details of the conversation, would it be true to say that you were talking just about background—I will withdraw the question.

In general terms, what were you talking about?

A. He seemed to be very interested in me. He wanted to know where I was from, whether I had any children, how long I had been here.

Q. Did you give him answers to his questions?

A. Yes.

Q. When you got to the gas station on the corner—there is the corner of what, Rosedale Avenue, would that be right?

A. I don't exactly remember the name, but I think yes it is.

Q. What happened?

A. Mr. Diaz said to me "this is the car." I said "but they are not going to steal it from here."

He said "you don't know what kind of thieves there are around here."

Then he said to me "check that door and see whether it is closed well."

Then I realized—I check and it was well closed, well closed, and he said "okay," and then we started back.

Q. And then what happened?

. . . .

Did Diaz do anything at that time?

A. Yes. I noticed that he signalled to me.

Q. What specifically did he do that you saw?

. . . .

He put his hand in a pointing fashion over your head, right?

A. Yes.

Q. What was the very next thing that happened next?

A. We kept on walking and then all of a sudden I saw a person who said "freeze," and then I saw that he is pointing a gun at me.

. . . .

Then I looked around to see whether it was for me, and then I saw that he is quite close and it was for me. Then I

raised my hands and I got down like this behind the car.

. . . .

When they arrested me there was a young man who was watching the arrest, and I said to him "please, if you know English, ask them why they are doing this to me."

*Id.* at 272–77.

During the prosecution's cross-examination, Alvarez basically repeated this account. He denied that Galan ever told him about the cocaine in the apartment, denied ever seeing the cocaine in the apartment, and denied having ever seen any cocaine in his life. *Id.* at 300–09.

Following his testimony, Alvarez rested. Susana then called Galan as a witness. Galan testified that although Susana was with him in his apartment on February 28 before Galan went to meet Suarez, Galan never told Susana anything about the cocaine. *Id.* at 334–36. Galan gave many glib responses on cross-examination—for example, when asked if he was sure that Susana was not in the dining room when Galan put the gun in the couch, he answered "I had never had mental problems," *id.* at 338—but also provided significant and conflicting testimony. First, Galan stated that Alvarez was already at the apartment when the others arrived. *Id.* at 345. He testified that Alvarez and Susana were watching television together, and that Galan called Susana into the kitchen. *Id.* at 345–46. Susana then placed two packages of cocaine on the table. *Id.* at 346–47.

After Diaz sampled the cocaine and asked for a ride to his car, Galan testified that it "was stupid to ask for a ride nearby the house. Nobody was going to give him a ride." *Id.* at 351. The following colloquy occurred at trial:

[MS. GRAY]: At the time that he asked for a ride you spoke to Mr. Alvarez, isn't that right?

A. With Mr. Alvarez, yes.

Q. And you told Mr. Alvarez to go with the confidential informant, isn't that correct?

A. That is correct.

Q. You told him to go with the confidential informant to get the money, isn't that right?

A. That is not correct.

Q. And when you told him to go with Mr. Diaz, the confidential informant, you were in the kitchen, weren't you?

A. Can you repeat the question again?

Q. When you told Mr. Alvarez to go with the confidential informant you were in the kitchen, weren't you?

A. I went to the living room. That was not in the living room, no. I meant it was not in the kitchen.

Q. And at this time the confidential informant and Mr. Alvarez left the apartment?

A. No.

Q. After you told Mr. Alvarez to go with the confidential informant, did they leave the apartment?

A. Actually, when I talked to him I told him to go out, but I didn't explain to him what he had to do.

Q. When you talked to Mr. Alvarez you told him to go out?

A. I didn't explain to Alvarez what he was supposed to do. I just told him to go with the CI. . . .

Q. After you asked him to go with the confidential informant, did the confidential informant leave your apartment?

A. Yes.

Q. And did Mr. Alvarez go with him?

A. Yes.

Q. Did you tell Mr. Alvarez to go to the store?

A. Before I sent him with the informant.

Q. So the answer is yes?

A. Yes.

*Id.* at 351–52.

Galan also testified on cross-examination that Alvarez left the apartment on two occasions that evening, once before leaving with Diaz. *Id.* at 357. The prosecution questioned Galan about statements he allegedly made before trial to DEA agent Jonathan Wilson. These statements conflicted with Galan's testimony in several respects, including the number of times

Alvarez left the apartment, *id.*, and Susana's knowledge of the existence and location of the cocaine in Galan's apartment. *Id.* at 354–67, 427–29.

Midway through Galan's cross-examination, Alvarez moved for a severance under Rule 14, Fed.R.Crim.P. *Id.* at 402–10. The Court denied the motion. *Id.* at 410.

Before Alvarez's counsel finished cross-examination of Galan, Galan testified about money he kept in Alvarez's room:

Q. [Alvarez] was staying in the front bedroom of [your] apartment, is that correct?

A. Where I had my study, yes.

Q. And you had some furniture in that study, is that right?

A. I had my desk where I wrote, and a small bed.

Q. Let me ask you about the desk where you wrote, okay? Now, Mr. Galan, was that the kind of desk that you could lock?

A. Yes.

Q. With a key?

A. Yes.

Q. Did you keep anything inside that desk?

A. Many important things.

Q. Among the things that you kept inside that desk, did you keep money inside that desk?

A. I kept money, I kept papers, important papers for my wife, and important papers for my business.

Q. So is the answer to the question did you keep money inside the desk, is the answer yes or no?

A. It is true.

Q. Did Mr. Alvarez have a key to that desk?

A. No.

Q. And this is the desk inside what was his bedroom at the time, is that correct?

A. Exactly. That's true.

Q. On February 28 of this year, did you leave about $8500 on top of that desk in Mr. Alvarez's bedroom?

A. No. The answer is no, because I left $13,500.

Q. On top of the desk, Mr. Galan?

A. No. Inside the locked desk.

Q. Did you ever see about $8500 on top of the desk?

A. No. . . . [I]n reality all of my money was always kept inside the desk.

Q. On February 28, did you see a large sum of money on top of the desk in Mr. Alvarez's bedroom?

A. That is not correct.

*Id.* at 430–32.

On rebuttal, the prosecution called only DEA agent Wilson. Wilson contradicted much of what Galan said. Perhaps most relevant to Alvarez, Wilson testified that in a conversation he had with Galan, Galan said that Diaz left the apartment by himself after tasting the cocaine—not with Alvarez. *Id.* at 447. Wilson also testified that Galan said that he had instructed Alvarez to go to the store and that Galan had given Alvarez money. *Id.* at 446.

On Thursday afternoon, July 20, 1989, counsel delivered summations. The prosecutor conceded that Susana was waiting in the kitchen when Alvarez's other co-defendants arrived with Diaz, *id.* at 474, and that Galan instructed Alvarez to walk with Diaz outside. *Id.* at 481. But the prosecutor also stated that much of what Alvarez said was uncorroborated and untrue:

Galan asks Alvarez to go with Diaz to get the money.

You have heard this from Diaz, you have heard this from Juan Morales, you have even heard this from Galan. They differ a little bit in the exact words that were used, that is clear, and Mr. Diaz even told you that it was Mr. Susana who told Alvarez to go to the store. Mr. Diaz made a mistake. It seems clear from the testimony of Mr. Morales, and the testimony of Mr. Galan, that it was Mr. Galan who said that. But it was said. Mr. Alvarez was told to go with the confidential informant.

At that time the confidential informant was acting in his role as an undercover, so to speak, in a cocaine deal. . . . When they left together they talked about cocaine. That's what makes sense. Use your common sense.

The confidential informant was walking to his car to get the money. He is going to ask about cocaine. He is upset about walking to the car. There was testimony about his asking for a ride. So the first thing he is going to do when he is alone with Mr. Alvarez is ask, why do I have to walk, and that's what he testified to. And the testimony was because you are a first-time buyer. In other words, they don't trust him yet, and they don't want to get too involved yet. First-time buyer. And Mr. Alvarez says "We've done a lot of business this day."

Mr. Diaz, acting as an undercover, pretending to be a drug dealer, is of course going to act the part, and so he is going to ask questions about are the people going to be back in the apartment when I get back there? He knows that the DEA agents are going to go back to the apartment, so he is going to want to find out. It makes common sense that Mr. Diaz would say exactly what he told you he said, and he asked about whether or not they will be there.

Mr. Alvarez responded, yes, we aren't kids, we don't play around, they are going to be there.

. . . .

Alvarez, in his testimony, the defendant, has told you that he was just going to the store, that he was going to the corner on Mr. Galan's instruction, and he was told to get some—actually, he says Mr. Diaz was told to get some beer. The confidential informant, Mr. Diaz, has denied that. He says they never stopped in the store, and they were never told to get beer, and he never bought any orange juice.

You have independent corroboration that that is indeed what happened. You have the testimony of Special Agent James Hunt, who also says "I followed them as they were walking. They did not stop, they did not go into a store."

. . . .

The partners in crime were arrested. Mr. Alvarez was arrested at the gas station. Mr. Susana was arrested in the living room. Mr. Galan was found hiding in a closet of his child's bedroom. Mr. Morales and Mr. Suarez were also arrested at the apartment. The defendants got caught with ten kilograms of cocaine in their apartment. . . .

Did Alvarez and Susana agree to work with Galan to sell cocaine? The answer is yes. They were working to sell two kilograms for $17,000 per kilogram, and they had 8 others stored in the apartment. They had done a lot of business. Mr. Alvarez told the confidential informant that they had done a lot of business. They had a lot of cocaine in the apartment ready to be sold.

Ladies and gentlemen, you can see that it is a lot of cocaine. You have heard that it is a lot of cocaine. The value of it indicates that it is a lot of cocaine. At $17,000 a kilo this is $170,000 worth.

. . . .

Ladies and gentlemen, you have heard the evidence from witnesses and from exhibits, and it comes in sometimes in bits and pieces. As to the confidential informant, and I know you are going to hear a lot about him on defense summation, you may not like the confidential informant. He was a drug dealer, and he told you that he was a drug dealer. But as a confidential informant he looks and he acts the part. That's one of the important things about being successful as a confidential informant.

I submit to you that on the stand his testimony was straightforward and credible. He admitted what he had done. He admitted bad things about himself. He didn't make any bones about that. When he didn't remember something he told you that he didn't remember something. He didn't make any bones about that. There is the testimony of Agent Hunt finding a large amount of cash on top of the dresser in Alvarez's room, the room that Alvarez lives in, that he doesn't share with anyone else.

Special Agent Hunt's testimony corroborates the testimony of the other witnesses, of Morales, of Diaz, about where they went and what happened next, and he saw Alvarez and Diaz leave together,

and he testified they didn't stop and buy any orange juice.

*Id.* at 480–88.

Counsel for Alvarez delivered his summation next. He argued that the case was a credibility contest that could only be decided in his client's favor, because the government had not met its burden of proof:

Let's have a look at what I submit to you is the most important evidence against Mr. Alvarez. Because I submit to you that without that evidence, basically the government is left with no case against my client whatsoever.

The most important evidence is.... Freddie Diaz. He was wheeled in here as a witness by [the] government. And what a textbook case, a classic example of—[well], appearances being deceptive. He looked marvelous. But as soon as he opened his mouth, you knew what you were dealing with.

....

He uses lies. That is part of his trade. That is what he does for a living.

....

... What does Jose Freddie Diaz, this kid who was born in the streets of the South Bronx, who was raised in the South Bronx, even though he is from the Dominican Republic, what does he say, this streetwise, street smart person? What does he say that my client said to him on the way over to the gas station, the corner—whatever it was, and I will come back to that in just a bit?

It's in the transcript of this trial. Ask for it if you don't remember it. He says:

"Q. After you left the apartment with Mr. Alvarez, what did you do?

"A. Well, I started asking him questions. Would the drugs be there when I get back with the money.

"Q. You asked him would the drugs be there when you got back with the money, what did he respond?

"A. He said, look, we ain't kids, we don't play around like that. It's going to be there. As long as you got the money, it's going to be there."

Ms. Gray's next question is: "did you ask him anything else?" and Mr. Diaz says "to this moment now, I can't really recall."

And then Ms. Gray says to him "did you ask him anything about the walking versus riding to the Mobil station?"

Of course Mr. Diaz was having a problem remembering his lines at that point and I suggest to you he needed a cue just to what he should be saying at that point.

"Yeah, I asked him why can't they give me, why can't somebody drive me over to where my car was. He says look, this is the first time you are buying from us. Today we sold more kilos than we ever sold any other day so this guy is kind of shaky, that's why he prefers you walking rather than driving you over there."

If you believe that my client said those words, those streetwise, street smart type of words, ladies and gentlemen, with the greatest of respect, I submit you are wrong. That's just the kind of bragging language that would come from the mouth, not, I submit to you, of Mr. Alvarez, but from Jose Freddie Diaz's lips. He said those words. He made them up.

....

A very big, I submit to you, reasonable doubt in this case against my client, the case against him, came when he himself testified....

Now, I submit to you that it wasn't just what he said that is believable, but it is the way in which he said it.... And how did the government impeach him, how did they attack his credibility? They didn't. Basically, I think you will find that Mr. Alvarez came away completely unscathed....

... [I]f you looked at him carefully as he testified, and although he was testifying through the use of an interpreter, if you listened to the sound of his voice, did this sound like the braggart, the street smart punk that used language like Freddie Diaz said he used? No, ladies and gentlemen, I submit to you he did not.

....

You also heard some testimony from several of the agents in connection with this

case. And I think it was Agent Hunt who testified that basically he supposedly kept Mr. Alvarez under surveillance the whole way from the front entrance of 1224 Taylor to the gas station....

I submit to you that the true and accurate version was in fact given to you by my client. Remember how in detail he described the juice, he thought it was apple juice, that Mr. Diaz had bought? And that he drank it on the way and threw the carton away? Also bear this in mind. Agent Hunt, group 33, Agent Wilson, group 33, Jose Freddie Diaz, he is one of the boys of course—group 33....

. . . .

Let's talk about money. Talk about money that was supposedly found on top of the dresser in my client's room. The suggestion, of course, is because it was found on top of the dresser in my client's room, that it was his. There was no evidence to show beyond a reasonable doubt that that money was his. None at all. In fact, ladies and gentlemen, you heard about the kind of money he makes, you got a sense I think of the kind of person he is.

The one person you did hear about in connection with that kind of money—and before I come to him, you also did hear, by the way, Agent Hunt conceded this point, that he wasn't the first agent in the apartment on that night, February 28. What happened was, the money was out on the dresser, he had no idea who had been into that room and where the money was actually recovered from. You can make that inference. You can draw that conclusion. The money was [on] the dresser when he got there.

Does it make sense these people would leave that kind of cash lying around, or is it much more reasonable to conclude, and I submit this is the logical inference, that in fact the money had been locked away in the drawer, as Mr. Galan testified.

Now, Mr. Galan. We didn't call him as a witness. Co-counsel did. Counsel for Mr. Susana. And whatever else you may think about Mr. Galan, bear one thing in mind: . . . he denies, vehemently denies that my client had any knowledge that there was a drug conspiracy, any knowledge there were drugs in the apartment. My client, ladies and gentlemen, worked for Mr. Galan in the garage. He lived in the apartment only temporarily. Fate sometimes deals us strange hands. Those of us who read the papers and watch TV must wonder with amazement at the scenes that we have seen from the [downed] airliner over Sioux City, Iowa . . . last night, [how] so many people could have survived. Who decided who should live and who should die? Nobody. I submit it was pure fate, it was pure luck. I submit to you, ladies and gentlemen, that it was pure bad luck that he started to work for Mr. Galan but 6 weeks before February 28 and he was staying in that room for 28 days when this all happened to him....

. . . .

. . . [T]hat night the DEA went fishing, they went fishing for very big fish that were [doing a deal] with two kilos of cocaine. And who got swept up in their net? Mr. Alvarez. They never expected to arrest him. He just happened to be in the wrong place at the wrong time. And merely associating with the wrong type of people, especially innocently so, that isn't enough, ladies and gentlemen.... Had they been more selective, I submit to you, Mr. Alvarez wouldn't be on trial here. The only person's word that they had to rely on was Jose Freddie Diaz. And now Jose Freddie Diaz's testimony can either sink him or save him, if you either accept it or reject it. Because without Jose Freddie Diaz what else can you really have against him?

*Id.* at 492–505.

Following summation by counsel for Susana, the prosecutor gave a brief rebuttal summation. Apparently recognizing that the case against Alvarez was not as strong as the case against Susana, Assistant United States Attorney Gray concentrated on the evidence against Alvarez. Indeed, she spent most of her time asserting the truthfulness of her witnesses:

[T]he credibility of the agents has been attacked. Mr. Leader talked about how the agents shaded their testimony, hid the truth in their testimony, the group 33 conspiracy theory that because they all work together that they must all be working together to shade the truth.

Now, Special Agent Hunt was asked ... about stopping at the grocery store....

At that time Mr. Alvarez had not taken the stand and had not given his version of the events.

Special Agent Hunt would have no reason to lie about what he saw and what he observed. He had no reason to shade the truth. If he saw him stopping at the grocery store there is no reason to say he didn't, and if he did not stop there there was no reason to say he did.

The group 33 conspiracy makes no sense....

But let's talk about credibility a little bit more. Juan Carlos Galan, who was truly a memorable witness in this courtroom....

... got on the stand and he testified in the way that he thought would help his friends, help his childhood friend Wilfredo Mejia Alvarez, his friend who had been staying with him in his home, help him get off the hook.

Ladies and gentlemen, I submit to you that the testimony of Juan Carlos Galan was completely and utterly incredible....

....

... Mr. Galan did not keep anything about this cocaine deal a secret from his good friend Luis Susana. Not only that, ladies and gentlemen, Mr. Galan did not keep it a secret from his good friend Mr. Alvarez.

Again, use your common sense. If Mr. Galan was keeping it a secret from Mr. Alvarez, would he trust him to walk with somebody who is going to get cash to buy cocaine, $34,000 in cash? Would he trust him to do that if he was keeping it a secret from him? Of course not. Because Mr. Galan would know that when they went outside they were going to talk about the cocaine deal. Of course

he wouldn't have Alvarez go along if Alvarez didn't already know that this was a cocaine deal.

If Mr. Galan was keeping it a secret from Mr. Alvarez there wouldn't have been $8500 in cash in Mr. Alvarez's room.

Now, ladies and gentlemen, defense counsel has suggested to you that that was locked away, and Mr. Alvarez didn't have access to it, but, ladies and gentlemen, the first agent in that room was Special Agent Toracinta, who said he went into that room and checked for people before he went into the living room.

Ladies and gentlemen, there is no evidence that any agent went into a locked desk and took anything out of a locked desk. Indeed, I submit to you they didn't....

....

Mr. Alvarez would have you believe that when he was told by Mr. Galan to go to the corner he never asked why, he just went in the bitter cold after having just been out. He didn't ask why. And Mr. Alvarez would have you believe that when he walked to the corner with the confidential informant he didn't ask the confidential informant, why he just did what he was told.

That doesn't make sense. That is not the way people act....

....

Galan tries to help Mr. Alvarez by saying that Mr. Alvarez didn't know, that he didn't tell him. Mr. Galan and Mr. Alvarez had discussed this case, but, ladies and gentlemen, the stories aren't straight. Mr. Alvarez says he wasn't there when they walked in. Mr. Galan says that Alvarez was there when they first walked in....

Ladies and gentlemen, the car business defense, the group 33 conspiracy defense, the orange juice defense, none of it, none of it makes sense....

*Id.* at 516–27.

On Friday morning, July 21, 1989, Judge DiCarlo charged the jury. At 12:02 p.m. the jury began deliberating.

Over the course of its deliberations, the jury sent a number of notes to the Court. First, the jury asked for a clarification of the definitions of conspiracy, possession, and constructive possession. *Id.* at 588. After Judge DiCarlo gave instructions on these matters, *id.* at 591–602, the jury asked for read-backs of testimony by 1) Diaz, regarding his walk with Alvarez; 2) Alvarez, regarding his walk with Diaz; 3) Morales, regarding who was in the kitchen; and 4) Morales, regarding any conversation between Alvarez and Galan, and regarding any conversation between Alvarez and any one else in the kitchen. *Id.* at 602–03. The relevant portions were read to the jury. *Id.* at 604–05.

At 6:30 on Friday evening, Judge DiCarlo discussed with the jury whether the jury members wished to continue deliberating or wished to break for 90 minutes to eat dinner and then return:

THE COURT: Does the jury wish to go out to eat or continue their deliberations without going out to eat?

JUROR NO. 2: We have a problem because not everybody can spend the length of time that might be necessary for us to resolve this tonight or Monday.

THE COURT: If this will not be resolved tonight the jury may seriously consider returning on Monday.

JUROR NO. 2: One of us can't return on Monday.

THE COURT: This jury has not been deliberating that long, and I think I will have to hear what the juror has to say, if the juror says he cannot return.

I would say in that event you try to resume your deliberations and resolve this among yourselves. If you want to come back on Monday, fine, because the case really cannot be disbanded because a juror finds it impractical or difficult to return on Monday.

Do you wish to deliberate further on this?

(Pause)

THE COURT: The litigants in this case, both the government and the defendant, are entitled to your full consideration of the issues involved, and your decision should not solely be based on the question of whether or not you want to return or not return.

All the parties are entitled to a decision in accordance with the charge I gave you, and I don't want to rush you in any way.

JUROR NO. 1: We still want to deliberate on the issues we heard while it is fresh. That was agreed between everyone, that we would like to continue.

THE COURT: Is it agreed the jury will continue to deliberate at least two hours, unless they have reached a determination in this case? Has that already been agreed upon between you, because I have a note saying an hour and a half to two hours?

JUROR NO. 1: Yes.

THE COURT: Is there any question you have of the court before the attorneys leave and I leave, because we all have to be present in the case of a request from the jury.

Do you believe any requests will be forthcoming soon?

JUROR NO. 1: No.

JUROR NO. 11: How about phone calls?

THE COURT: Phone calls will be made for you. Phone calls with the messages will be made.

You can return and resume your deliberations. If you reach a point where you feel you will not conclude your deliberations, and you would prefer to put it over to Monday, then you will inform the court of that fact.

All right.

You may return to the jury room and continue you deliberations. We are here to be convenient to the jurors as much as possible, but again I say to you that your determination in this case should not be based upon the fact that you don't want to come back on Monday, or you want to go home this evening. That would not be fair to any party in this case.

JUROR NO. 1: Is there any way to get anything cold to drink?

THE COURT: Let's attempt to do it.

JUROR NO. 1: I think there is a mixture of coffee and some wanting something cold.

THE COURT: I'm sorry we didn't get the messages earlier, because we could have had dinner sent to you. I thought we had until 5:30. I was proven wrong. We will attempt to get something of a cold nature into the room.

*Id.* at 608–10.

The jury resumed deliberations and later sent two more notes to the Court. The first note asked: "Your Honor, in regard to the law pertaining to possession—if a person is said to be guilty of part of a conspiracy—is he then responsible for the actions of any or all of the other conspirators?" *Id.* at 611. In response to this note, the Court conferred with counsel and the jury. Judge DiCarlo ultimately gave instructions about the crime of possession. *Id.* at 628–39.

The second note stated: "Your Honor, we would like to express that the entire jury was disappointed that we had to use one half hour of our deliberation time to come up with change for the sodas. We all felt that the marshals present were quite uncooperative and bri[s]k in this matter." *Id.* at 614. In response to this note, Judge DiCarlo apologized for any inconvenience. He explained that the marshals did not carry change for drinks. *Id.* at 626. He also offered the jurors the options of continuing to deliberate, returning on Saturday for deliberations, or returning Monday:

I am willing to stay here later in the evening. I want to make sure if we do stay that you are being fair to yourselves, and you are being fair to the litigants in the case. When you go back I want you to understand that.

Even though it may be an inconvenience to many of you, we are willing to come back tomorrow if you believe that's what

is in the best interests of justice in this case.

*Id.* at 627.

Deliberations resumed that evening. At 9:45 p.m., the jury found Alvarez guilty on counts one and two, and Susana guilty on counts one through four.

### Post–Trial

Alvarez appealed his conviction. Marjorie M. Smith, Esq., of the Legal Aid Society was appointed to represent him before the Second Circuit. Alvarez also submitted a supplemental pro se brief.

Smith argued that Judge DiCarlo's instructions to the jury were improper, as was an instruction he gave to Leader that Leader should not discuss Galan's possible invocation of the Fifth Amendment with Alvarez. In his supplemental pro se brief, Alvarez argued that trial counsel was ineffective.[5] For example, Alvarez claimed that Leader should have tried to find evidence that Alvarez and Diaz visited the grocery store together. Pro Se Supplemental Brief at Addendum D. Alvarez also argued that the conviction should be reversed because of the government's misconduct. *See id.* at Issues 2 & 3–Addendum J. He claimed, for example, that the government's use of a confidential informant violated due process. *Id.* at Addendum F.

On March 26, 1991, the Court of Appeals issued a summary order affirming Alvarez's conviction. The order expressly addressed only those issues briefed and orally argued by Smith. Order at 2–4.

On September 9, 1991, Alvarez submitted a pro se brief seeking vacatur of his conviction pursuant to 28 U.S.C. § 2255. He again asserts that trial counsel was ineffective, that government misconduct deprived him of a fair trial and entitles him to dismissal of the indictment, and that Judge DiCarlo's instructions to the jury were erroneous. Alvarez's pro se brief reproduces large portions of his supplemental brief,

---

**5.** A copy of Alvarez' supplemental pro se brief was provided by the government. It appears as Exhibit B attached to the government's brief of November 15, 1991 filed in opposition to the

habeas corpus petition. The pro se brief was not paginated. This opinion therefore cites to the headings used in the pro se brief.

although he has added a few citations to cases and summaries of cases.

He also claims that not only was trial counsel ineffective, but so was appellate counsel. He argues that Smith erroneously challenged the *Pinkerton* jury instruction without first challenging the sufficiency of the evidence, and that she refused to argue the issues contained in Alvarez's supplemental pro se brief. Sept. 9, 1991 Brief at Point 3; Reply Brief at 3.

The government filed a brief in opposition on November 15, 1991, and Alvarez filed a pro se reply on December 9, 1991. While this Court was considering the briefs, the government advised the Court that it would be submitting additional material that could affect the Court's decision.

That additional material came in the form of two government letters to the Court dated April 23, 1992. The first letter is an *ex parte* communication that remains under seal on request of the government. The second letter states that the government had learned of allegations against two of the witnesses involved in Alvarez's criminal case—Special Agent Hunt of the DEA, and Jose Freddie Diaz, the CI formerly employed by the DEA and the man whose testimony directly implicated Alvarez at trial. As the government describes on pages 1–2:

> In the case of *United States v. Huascar Lara et al.*, 89 Cr. 1006 (S.D.N.Y.1990), there is an allegation that Agent Hunt exceeded the lawful scope of a search and then lied at the subsequent suppression hearing regarding the location from which items were seized. It has been alleged that Mr. Diaz also lied at the suppression hearing in the same case about the circumstances of the search. All of the evidence pertaining to these allegations is in the public record of the suppression hearing. No grand jury or administrative body has made any findings against either Agent Hunt or Mr. Diaz.

These allegations, the government states in the letter, were raised more than a year after Alvarez's trial. The government states that it reviewed the record of Alvarez's trial in light of these new allegations "[i]n the interests of justice." Letter at 1. Having done so, the government concludes that "none of the allegations ... calls into question the jury's verdict, nor has any bearing on the proper disposition of Alvarez's Section 2255 petition." *Id.* The four-page letter includes a discussion of cases supporting the government's conclusion. The letter also summarizes the facts of Alvarez's case as revealed at trial, and why they should remain unquestioned.

In an Order dated April 24, 1992, I directed the government to provide Alvarez and the Court with the materials relating to the *Huascar Lara* suppression hearing. The Order also directed Alvarez to address the merits of his petition in light of these new materials.

The *Huascar Lara* hearing took place before Judge Conboy of this Court. The hearing, which involved Group 33 and featured the testimony of both Hunt and Diaz, culminated in sharp criticism from Judge Conboy:

> It's one thing to have agents or policemen or any witness be candid and say, "Yes, a mistake was made." And if that were all there was here, if there was just one witness, but every one of them presented extraordinarily confusing and problematic testimony.
>
> . . . .
>
> Now, surely, there is something more here than simply—with respect to the scale than simply a failure of recollection or a deviance from some formal rule of the DEA. I mean, that testimony with respect to the scale bordered frankly on the preposterous.
>
> Now, the gun, we have, I don't know, four or five different versions of how the gun essentially reaches this table as an exhibit. We have one officer saying he raised the gun and shouted and alerted everyone. No one else seems to recall that. The second agent says he saw it and said nothing, even though it was within the reach of defendants. We have this agent, the final agent who testified, McKenna, saying he looked at the table,

he looked at the bed and he looked at the floor and didn't see the gun.

Now, it may have been on the ceiling, or it may have been dangling out of the window on a rope. Those two, we didn't hear in this hearing. But there is just an artificiality to this. There is something that is extraordinarily makeshift about how they come in here.

And then we get to the critical evidence in the case, which is all this powder on the floor. We're told in one statement to the United States Attorney that the informant and the agent were sweeping it up. We're told by Welsh that he said that he meant to suggest to the U.S. Attorney that there wasn't any simultaneous sweeping.

I mean, please. Come into the real world. This is a technique or a device to paper over the substantial problem with respect to this.

. . . .

And what I must say to you is that, as I said before, it's one thing to have a deviation from a regulation and candor. We come in and we admit freely. These agents didn't come in and admit freely. It's Miss Martinez that stimulated it. And at that point, it was any port in a storm, to be frank about it.

And the informant [Diaz], well, he gave the personal problems blocking his memory?

Listen. I'm going to say no more about this. I'm going to give you whatever time you need to file your papers. I think the government should carefully re-examine this case. And I think it should be reviewed at a higher level in the office than you. And I think you should consider this.

This is the integrity of the United States Attorney's Office and the DEA which transcends the question of whether these defendants are convicted or whether these agents get off the hot spot here with a, quote, "oh, they are to be absolved because they came in and fundamentally said they made mistakes." They had no choice.

That affidavit and that complaint and the grand jury testimony? That's a lot more than a simple mistake or a deviation. It is riddled with falsehoods in there. I'm not saying intentional. I'm not in a position to say that. That's the U.S. Attorney's job to decide whether there was obstruction of justice or perjury.

*Huascar Lara* Transcript at 716–20.

Marjorie Smith, Esq., the court-appointed counsel who represented Alvarez on the appeal of his conviction, received the *Huascar Lara* materials from the government. On May 12, 1992, she submitted a memorandum of law supporting Alvarez's habeas corpus petition. It addresses the allegations against Diaz described in the government's second letter of April 23, 1992. It also discusses five other proceedings in which Diaz testified: one trial that pre-dated the Alvarez trial and four trials that post-dated the Alvarez trial. According to Smith, Diaz gave false testimony at the Alvarez trial and in a number of other trials, as well as the *Huascar Lara* hearing. Given Diaz's perjury, Smith argues, the appropriate relief is to vacate the conviction.

On May 13, 1992, I held an *ex parte* conference with the government to discuss the sealed letter of April 23, 1992. At that conference the government informed the Court of the status of its investigation. The government then answered Smith's May 12 submission with a memorandum of law dated June 26, 1992. It confirmed the position it took in the unsealed letter of April 23, 1992, although with the elaboration permitted by a 23–page brief. Smith submitted her reply brief on July 24, 1992.

After reviewing these papers, I concluded that the sealed letter of April 23 should be revealed to defense counsel. I reached this conclusion after discovering that the government had not accurately characterized the significance of Hunt's testimony. The government had suggested at the May 13 *ex parte* conference that Hunt was a peripheral figure at trial; therefore, the government indicated that evidence in the sealed letter of April 23 would be irrelevant. But a review of the trial transcript

shows that Hunt was a pivotal witness who provided crucial corroborating testimony. Defense counsel had a right to know about the evidence under seal. Because the government had requested an opportunity to be heard before the Court ordered disclosure, however, I convened an *ex parte* conference with the government on September 30, 1992 to discuss the consequences of unsealing the letter. At that conference the government agreed to limited disclosure.

Accordingly, in an Order dated September 30, 1992, 1992 WL 276857, I directed that the sealed letter of April 23, 1992 be disclosed, but only to Alvarez and his counsel. I also permitted the parties to address the contents of this letter in a further round of briefing.[6]

Defense counsel then submitted under seal, on October 19, 1992, a supplemental memorandum of law seeking vacatur of the conviction pursuant to 28 U.S.C. § 2255 and a new trial pursuant to Rule 33, Fed. R.Crim.P. Defense counsel also filed a motion for bail pending resolution of the motions. The government filed opposition papers under seal on November 4, 1992. Defense counsel replied under seal on November 10, 1992.[7]

With this third round of briefing, the Court now effectively has two habeas corpus petitions and a Rule 33 motion before it. The first petition seeks to vacate Alvarez's conviction on the grounds of, *inter alia,* ineffective trial and appellate counsel, as well as governmental misconduct. The second seeks vacatur on two grounds: 1) that the chief witness against Alvarez, Jose Freddie Diaz, committed perjury at Alvarez's trial; and 2) that Diaz and Hunt gave false testimony at proceedings subsequent to trial, thereby fatally undermining confidence in the outcome of Alvarez's trial.

The Rule 33 motion seeks a new trial on the grounds of newly discovered evidence.

For the reasons stated in an opinion to be issued separately, the first habeas petition is denied. For the reasons stated below, the second habeas petition is denied, and the motion for a new trial is granted.

## DISCUSSION

### I. *Habeas Petition #2*

A. Diaz's Perjury At Trial

Alvarez argues first that the government knowingly permitted Diaz to commit perjury at trial. Alvarez does not claim, to be sure, that this perjury concerned the conversation he had with Diaz on February 28, 1989—though that conclusion may be implicit in his argument. Instead, Alvarez claims that Diaz lied about several other subjects at trial, that the government knew it at the time, and that the government remained silent.

If these claims are correct, then the conviction is on precarious ground. As the Second Circuit has held, "if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991) (*"Wallach I"*) (citations omitted).

This result follows from the well-established principle that knowing use of perjured testimony violates the due process clause of the Fourteenth Amendment. *Perkins v. LeFevre,* 642 F.2d 37, 40 (2d Cir.1981); *DuBose v. LeFevre,* 619 F.2d 973, 978 (2d Cir.1980). So long as there is "any *reasonable likelihood* that the false testimony could have affected the judgment of the jury," *Wallach I,* 935 F.2d at 456 (citations omitted) (emphasis added), the conviction must be set aside. *Id.* This

---

**6.** The September 30 Order was later modified by an Order dated October 5, 1992. The latter order directed counsel, if so advised, to discuss the facts of this case in the context of Rule 33, Fed.R.Crim.P.

A further order, dated October 8, 1992, directed disclosure of the transcript of the *ex parte* conference held on September 30, 1992. Like the disclosure of the sealed letter, the transcript was disclosed only to defendant and defense counsel.

**7.** Pro se defendant's arguments are addressed in a separate opinion. Accordingly, since I need not distinguish the arguments made by defendant himself from those made by his defense counsel in the remainder of this opinion, I resume the practice of referring to defense arguments as if they were made by Alvarez himself.

same standard applies even where the government did not actually know of the perjury but should have known. *Id.*

As a variation on his first argument, Alvarez claims that the conviction should be vacated even if the government could not have known of Diaz's perjury at trial. Quoting *Wallach I,* Alvarez states that "[w]here the government was unaware of a witness' perjury, 'a new trial is warranted . . . if the testimony was material and the court [is left] with a *firm belief* that but for the perjured testimony, the defendant would most likely not have been convicted.' " Memorandum of Law dated May 12, 1992 ("Alv. May 12 Brief") at 26 (quoting *Wallach I,* 935 F.2d at 456) (emphasis added).

I need not decide what the government knew and which test applies in the case at bar—whether the "reasonable likelihood" or "firm belief" standard—because the petitioner has failed to demonstrate the factual predicate triggering the tests: that Diaz committed perjury at all.

In trying to establish that he did, Alvarez compares Diaz's testimony at petitioner's trial with testimony Diaz gave at other proceedings. He then declares that Diaz perjured himself at the Alvarez trial in four subject areas: 1) whether Diaz lied only to drug dealers in the course of his work as a confidential informant; 2) the circumstances under which the DEA learned of his prior criminal history; 3) the length of time he had been a drug dealer; and 4) the number of illegal drug sales he had made.

I have judged his statements on these subjects "according to common sense standards," considering "their natural meaning in relation to their context." *U.S. v. Schafrick,* 871 F.2d 300, 303 (2d Cir.1989). I have also compared them with testimony he gave at other proceedings. My conclusion is that the statements do not rise to the level of perjury.

█ In his first example of false testimony, Alvarez observes that when Diaz was asked if he considered himself a good liar, he answered "when I'm dealing with the drug dealers, yes. Only when I'm working on my job." *Alvarez* Tr. at 71. But in another trial one month later Diaz was asked if, after agreeing to cooperate with the DEA, he had informed the DEA that he had a case pending in New York state court for selling crack cocaine:

Q. [Y]ou are telling me that [the DEA] didn't know about this case?

A. I hadn't told them anything about this. They found out about this case when I was in jail. In other words, I was hiding it from them.

Q. Didn't they ask you if when you signed this cooperation agreement—

A. When I had—

Q. Let me finish the question. When you signed this cooperation agreement were you not debriefed, were you not spoken to by either [DEA Agent] Hunt or other members of the DEA office and didn't they ask you if you had a case pending?

A. Again, I say, yes, they asked me but I was scared at the time so I lied, I hid that from them.

*United States v. Victor Batista,* 89 Cr. 399, Alv. May 12 Brief, Exh. G, Tr. ("*Batista* Tr.") at 105–06. Diaz again admitted lying to the DEA in *United States v. Amable Garcia, et al.,* 89 Cr. 629, Alv. May 12 Brief, Exh. H, Tr. ("*Garcia* Tr.") at 1158 and *United States v. Oswaldo Arango, et al.,* 89 Cr. 809, Alv. May 12 Brief, Exh. I., Tr. ("*Arango* Tr.") at 197.

While Diaz admitted lying at these trials, it does not follow that he lied at Alvarez's trial. At the petitioner's trial Diaz did not deny lying to the DEA; what he denied was whether he was a *good* liar. That distinction is clear upon consideration of the entire colloquy, without excluding the questions:

THE COURT: . . . . Do you consider yourself a good liar?

DIAZ: When I'm dealing with the drug dealers, yes. Only when I'm working on my job.

Q. Only when you are working on your job do you consider yourself a good liar, correct?

A. Yes.

Q. So you don't consider yourself a good liar when you have to testify before a jury, right?

A. Well, I was told—

Q. Just yes or no, Mr. Diaz?

A. No, I am not a liar.

. . . .

Q. Do you consider yourself a good liar when you have to testify in front of a jury?

A. No.

*Alvarez* Tr. at 71–72.

As the Second Circuit stated in *United States v. Lighte*, 782 F.2d 367, 373 (2d Cir.1986), how a witness interprets a given question need not turn on "isolated segments of the question and answer exchange" but on "the entire line of questioning." Accordingly, I find that Diaz did not commit perjury about his statements to the DEA.

■ As a second example of perjury, Alvarez claims that Diaz lied when he stated that "after a while working with [the] DEA, I came up to, I think it was agent John McKenna, and I told him about my [previous convictions]." *Alvarez* Tr. at 113. This was a lie, asserts Alvarez: "[t]he truth, as revealed in subsequent trials, was that Diaz lied to the DEA and hid his New York State crack case for 'a long time'; he only revealed this case when he was arrested on a bench warrant because he 'had no choice.'" Alv. May 12 Brief at 22.

But Alvarez's arguments are conclusory. Despite his assertions, "[t]he truth, as revealed in subsequent trials" is not at all inconsistent with Diaz's testimony at the *Alvarez* trial. Indeed Diaz admitted, in the answer immediately preceding the answer Alvarez quotes in his brief, that he did not tell the DEA about his convictions when he began cooperating. *Alvarez* Tr. at 113. The fact that the testimony Diaz gave in the *Alvarez* trial does not precisely track the language he used in different proceedings, in response to different questions,

does not make it false. Such a finding would distort the concept of perjury.[8]

■ The third example of alleged perjury also fails. Alvarez claims that Diaz lied about how long he had been a drug dealer but the record is, at best, equivocal. Diaz stated at the Alvarez trial that he had been a drug dealer for "about a year," *id.* at 77. In one other trial he also stated the period was about one year. *Batista* Tr. at 79. In two other trials, however, he estimated "about two years." *Garcia* Tr. at 1100; *Arango* Tr. at 137. Thus, Alvarez gave different answers in different trials to the same question.

While the answers were inconsistent, perjury "requires that a witness believe that the testimony he gives is false." *United States v. Lighte*, 782 F.2d at 372. "Differences in recollection alone do not add up to perjury." *United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir.1992). Given the qualified nature of these responses, it is a close question whether Diaz perjured himself. Miscalculation or innocent mistake seems a more likely explanation given the nature of the answers and the discrepancy involved. I need not decide the point, however; even assuming that Diaz intentionally misled the jury, there is no evidence that the government knew or should have known that Diaz was testifying falsely. Accordingly, the Court must be left with a "firm belief" that the outcome would have been different had the jury been aware of this perjury. While Diaz's credibility was crucial to the government's case, *see* discussion, *infra,* I am not prepared to say that this one "lie" would alone have changed the outcome of the trial.

■ As a final instance of perjury, Alvarez claims that Diaz lied about the number of times he had sold drugs. At the *Alvarez* trial Diaz stated that he "did" about "15 deals at the most." *Alvarez* Tr. at 77. At a subsequent trial, when asked about his career selling crack, Diaz agreed that the figure was "somewhere between 20 and thousands." *Garcia* Tr. at 1036–38.

---

**8.** Alvarez's arguments concerning the cooperation agreement are similarly meritless. Nothing in the record suggests Diaz lied about this subject.

Later in the *Garcia* trial, however, Diaz distinguished between large drug deals involving two kilos or more, and small drug deals. *Id.* at 1210–11. In light of this further explanation Judge Patterson, who presided over the *Garcia* trial, held that the statements were not inconsistent:

We always have this problem about context under which questions and answers are given and the transcript does not reflect what the entire context of the discussion was or what the witness had in mind. It does not necessarily mean he lied. It may mean that he made a statement which was different and inconsistent with what he said before, but he has to have an opportunity to make an explanation of his testimony, and I think that a sufficient explanation has been done.

*Garcia* Tr. at 1214–15. I agree.

Alvarez's petition to vacate the conviction on the grounds that Diaz committed perjury at trial is therefore denied.

**B. Diaz's Post-trial Perjury**

 Even if Alvarez cannot show that Diaz committed perjury at trial, Alvarez claims that Diaz's perjuries after trial so discredit the witness that his original testimony is no longer credible. For this proposition Alvarez relies on *Mesarosh v. United States*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956).

In *Mesarosh* the petitioners were five persons who had been convicted of conspiring to advocate the overthrow of the United States government. After the Supreme Court granted their petition for certiorari, but before oral argument, the Solicitor General of the United States filed a motion calling the attention of the Court to the testimony given in other proceedings by Joseph D. Mazzei, one of seven witnesses for the government in its case against the petitioners. In that motion the Solicitor General stated that the government now had serious reason to doubt the truthfulness of Mazzei's testimony in those other proceedings. The motion stated that while the government adhered to its position that "the testimony given by Mazzei at the trial [in this case] was entirely truthful and

credible," *Mesarosh*, 352 U.S. at 4, 77 S.Ct. at 3, "these incidents, taken cumulatively, lead us to suggest that the issue of his truthfulness at the trial of these petitioners should now be determined by the District Court after a hearing." *Id.*

The material indicating untruthfulness was substantial:

1) In a petition to set aside a conviction for adultery and bastardy—a conviction which was revealed at petitioners' trial on cross-examination—Mazzei stated that he was not guilty of the charge. Mazzei claimed that he had pleaded guilty only in his official capacity as a government informant and at the insistence of his superior in the FBI. A Special Agent of the FBI later denied these allegations under oath, and the petition to set aside the conviction was dismissed, *id.* at 5, 77 S.Ct. at 3;

2) While testifying against a man named Leo Sheiner in disbarment proceedings before a Florida court, Mazzei reiterated his charge that he was induced to plead guilty by the FBI, *id.* at 6, 77 S.Ct. at 4;

3) Mazzei testified in those disbarment proceedings that, among other things, the Communist Party made plans in 1948 for the armed invasion of the United States on orders from the Soviet Union; that Mazzei was taught by the Communist Party of Pittsburgh how to blow up bridges, poison reservoirs, and "eliminate" people; that he discussed with Sheiner "knocking off" a Florida judge and importing a Communist Party man to do the job; that Mazzei and the Communist Party made plans to assassinate senators and congressmen; and that Sheiner was extensively engaged in Communist Party activities. None of this testimony was supported by information in possession of the government, *id.* at 6–7, 77 S.Ct. at 4;

4) Mazzei testified that the FBI arranged for him to get into the Army so that he could watch a Communist Party member. In fact, the FBI had nothing to do with his service in the Army, *id.* at 7, 77 S.Ct. at 4;

5) Mazzei testified that the FBI paid him about $1,000 a month for expenses. FBI records showed that in a ten-year period,

Mazzei was paid a total of $172.05 as expense money, *id.;* and

6) Mazzei testified that he had never been arrested in his life. In fact, he had been arrested at least once before. *Id.*

At oral argument on the Solicitor General's motion to remand, the Solicitor General stated that not only did he personally believe some of Mazzei's post-trial testimony was false, but the Department of Justice was *certain* that some of it was false. Nevertheless, the Solicitor General stated that he was not prepared to say Mazzei committed perjury at any of the proceedings. His theory was that while Mazzei testified falsely, he may not have done so knowingly: Mazzei may have testified falsely as a result of a psychiatric condition and that condition may have arisen subsequent to petitioners' trial. He therefore asked the Court to remand the case for a full consideration of Mazzei's trial testimony. *Id.* at 8, 77 S.Ct. at 5.

The Supreme Court opted for a more extreme remedy:

> Either this Court or the District Court should accept the statements of the Solicitor General as indicating the unreliability of this Government witness. The question of whether his untruthfulness in these other proceedings constituted perjury or was caused by a psychiatric condition can make no material difference here. Whichever explanation might be found to be correct in this regard, Mazzei's credibility has been wholly discredited by the disclosures of the Solicitor General. No other conclusion is possible. The dignity of the United States Government will not permit the conviction of any person on tainted testimony. This conviction is tainted, and there can be no other just result than to accord petitioners a new trial.

*Id.* at 9, 77 S.Ct. at 5.

Alvarez now claims that his conviction was similarly tainted. He alleges that the taint is supplied by Diaz's post-trial admissions of 1) lies to the DEA, *see Batista* Tr. at 106; *Garcia* Tr. at 1104, 1158; *Arango* Tr. at 197 and 281; 2) lies to juries concerning the time he spent as a drug dealer, *see*

discussion, *supra,* and *Batista* Tr. at 79; *Garcia* Tr. at 1100; *Arango* Tr. at 137; 3) a lie to an Assistant United States Attorney, *see Arango* Tr. at 281–82, 295–96; and 4) a lie to a jury about his personal drug use. *See Garcia* Tr. at 1178.

The conviction is also allegedly tainted by the evasive testimony Diaz gave in post-trial proceedings and the faulty memory he exhibited at these proceedings. *See* Alv. May 12 Brief at 18.

Finally, Alvarez argues that his conviction is unreliable given the information first raised in the sealed letter of April 23, 1992 about Diaz and Agent Hunt.

But while these matters may indeed raise serious questions about Alvarez's credibility, this case does not fall under the doctrine of *Mesarosh* for two reasons. First, *Mesarosh* was decided upon a motion not by the defendant, but by the government:

> It must be remembered that we are not dealing here with a motion for a new trial initiated by the defense, under Rule 33 of the Federal Rules of Criminal Procedure, presenting untruthful statements by a Government witness subsequent to the trial as newly discovered evidence affecting his credibility at the trial. Such an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is "merely cumulative or impeaching" is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial.
>
> Here we have an entirely different situation. . . . It is the Government which now questions the credibility of its own witness because in other proceedings in the same field of activity he gave certain testimony—some parts of it positively established as untrue and other parts of it believed by the Solicitor General to be untrue. . . . The Solicitor General conceded that without Mazzei's testimony in this case the conviction of two of the petitioners cannot stand. . . .

*Mesarosh,* 352 U.S. at 9–10, 77 S.Ct. at 5–6.

While the government's letters of April 23, 1992 prompted the petitioner's argu-

ments of taint in the case at bar, the government has conceded nothing. Nor has it made a motion to remand or to reassess Diaz's credibility. Accordingly, given the Supreme Court's explanation of its holding in *Mesarosh*, and my reading of it, I find that Alvarez's argument fails.[9]

The second reason *Mesarosh* is inapposite concerns the nature of the evidence allegedly constituting taint. While the evidence offered by Alvarez is disturbing and gives the Court considerable pause, I am not persuaded that it comes within the embrace of *Mesarosh*. *Mesarosh* was limited to untruthful testimony that the government witness gave before other tribunals. *See, e.g., Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 357, 83 S.Ct. 448, 458, 9 L.Ed.2d 357 (1963). Claims that Diaz testified evasively and with a disturbing loss of memory are not relevant here. Nor, for that matter, are the issues raised in the sealed letter.

As for evidence of Diaz's and Hunt's untruthful testimony at the *Huascar Lara* suppression hearing and on other occasions, I do not believe it rises to the level of *Mesarosh* taint:

> *Mesarosh* involved that rare situation where a key witness who was accusing

people of Communist affiliations ... testified against others in a Senate investigation in such a bizarre fashion as to raise the inference that he was either an inveterate perjurer or a disordered mind. His suspected perjury, it must be noted, was not with respect to his own past. He was a professional witness who was identifying many persons as directly involved in Communist activities.

*United States v. Rosner*, 516 F.2d 269, 279–80 (2d Cir.1975), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). Diaz's post-trial perjuries and Hunt's alleged post-trial perjuries do not involve falsely incriminating others. They do not invite descriptions like "bizarre." They are not extensive in number or in degree. In short, they do not amount to the kind of "taint" contemplated by the Supreme Court in *Mesarosh*.

Accordingly, Alvarez's second habeas corpus petition is denied.

### Rule 33

Alvarez also moves for a new trial under Rule 33, Fed.R.Crim.P. Rule 33 provides in pertinent part:

---

**9.** Alvarez argues that who makes the motion or whether the government concedes anything is irrelevant to the central holding of *Mesarosh*. This argument has undeniable force. The thrust of *Mesarosh* was that a tainted conviction cannot stand. Arguably, then, the existence of the taint should not turn on the government's magnanimity, but on the strength of the evidence. While a concession by the government may provide an institutional marker that the conviction is tainted, it is curious that such a concession should be a condition precedent. Indeed, in another setting the government's decision not to prosecute is not a condition precedent to finding that a defendant is not guilty.

This less narrow reading of *Mesarosh* is buoyed by the facts as stated in the *Mesarosh* dissent. There Justice Harlan asserts that the Solicitor General did not admit very much at all. "[W]e think it abundantly clear the Solicitor General conceded no more than that the situation was one that called for a thorough investigation." *Mesarosh*, 352 U.S. at 21, 77 S.Ct. at 12 (Harlan, J., dissenting). Alvarez's argument also finds support in the Ninth Circuit, which has found convictions tainted and reversed on *Mesarosh* grounds even where the

government was not the moving party. *See Williams v. United States*, 500 F.2d 105 (9th Cir.1974); *United States v. Chisum*, 436 F.2d 645 (9th Cir.1971).

The Second Circuit has not addressed the issue directly. It has indicated, however, that the government's concession in *Mesarosh* was critical to the outcome. *See United States v. Stofsky*, 527 F.2d 237, 246 (2d Cir.1975) ("this court has noted that *Mesarosh* is a *sui generis* case") (citations omitted), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 66, 50 L.Ed.2d 80 (1976); *United States v. Rosner*, 516 F.2d 269, 282 (2d Cir.1975) ("It is true that on the strange facts of the *Mesarosh* case, a majority of the court voted for a new trial rather than a hearing, but, .... [i]t was the government that moved in the Supreme Court for a hearing in the trial court."), *cert. denied*, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976); *United States v. Zane*, 507 F.2d 346, 348 (2d Cir.1974) ("[*Mesarosh*] did not involve a defense motion for a new trial but rather a *sui generis* exercise by the Supreme Court of its supervisory jurisdiction at the instance of representation submitted by the Solicitor General."), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1563, 43 L.Ed.2d 775 (1975). I am not prepared to hold differently.

The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment....

Alvarez was convicted on July 21, 1989. Because the Second Circuit did not affirm the conviction until March 26, 1991, the two years have not yet run. *See, e.g.,* 3 Wright, *Federal Practice and Procedure: Criminal* § 558 at 361 (2d ed. 1982) ("The rule requires that a motion based on newly discovered evidence be made within two years after final judgment. If an appeal is taken, this time period runs from issuance of the mandate of affirmance by the appellate court.") (footnotes omitted). This motion is therefore timely.

But it is not favored. Rule 33 motions "are granted only with great caution ... in *the most extraordinary circumstances.*" *Sanders v. Sullivan,* 863 F.2d 218, 225 (2d Cir.1988) (quoting *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987) (emphasis in original)). The interest in according finality to a jury's verdict, as well as the tirelessness of defendants seeking new trials, may explain this sensible and realistic judicial practice. As one commentator has noted, "[n]o court wishes a defendant to remain in jail if he has discovered evidence showing that he is not guilty, but after a man has had his day in court, and has been fairly tried, there is a proper reluctance to give him a second trial." 3 C. Wright, *Federal Practice and Procedure* § 557 at 315.

In light of this reluctance, courts apply a three-part test for Rule 33 motions made on the basis of newly discovered evidence. First, a new trial will not be granted unless the evidence could not with due diligence have been discovered before or during trial. *E.g., United States v. White,* 972 F.2d 16, 20 (2d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992); *Sanders v. Sullivan,* 863 F.2d 218, 226 (2d Cir.1988); *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987); *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980). Second, a new trial will not be granted unless the newly discovered evidence is material and not merely cumulative. *E.g., United States v. White,* 972 F.2d at 21; *United States v. Alessi,* 638 F.2d at 479. Finally, the third and most difficult principle to apply, a new trial will only be granted if admission of the newly discovered evidence "would probably produce an acquittal." *E.g., United States v. Diaz,* 922 F.2d 998, 1006 (2d Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2035, 114 L.Ed.2d 119 (1991); *United States v. Parker,* 903 F.2d 91, 102 (2d Cir.1990), *cert. denied,* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990); *United States v. Petrillo,* 821 F.2d 85, 88 (2d Cir.1987); *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir. 1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); *United States v. Alessi,* 638 F.2d at 479; *United States v. Stofsky,* 527 F.2d 237, 243 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 66, 50 L.Ed.2d 80 (1976).[10]

10. Courts have also phrased this final principle as whether the newly discovered evidence, if known by the jury that already convicted the defendant, would have led *that* jury to reach a different verdict. *See, e.g., United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976) ("[T]he severe burden of demonstrating that newly discovered evidence probably *would have resulted* in acquittal" is "the standard generally applied by lower courts in evaluating motions for new trial under Fed. Rule Crim.Proc. 33 based on newly discovered evidence.") (emphasis added); *United States v. Bermudez,* 526 F.2d 89, 100 (2d Cir.1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). However, this alternate language is generally used only when the newly discovered evidence physically existed but was undiscovered at the time of the trial, *e.g., Bermudez,* 526 F.2d at 100, or in the context of a perjury claim. *E.g., United States v. White,* 972 F.2d at 21; *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992). I therefore need not apply the surreal test of considering what the *prior* jury would have done with new evidence concerning events that had not yet happened. I need only consider what a *future* jury would do with this new evidence.

Of course in addressing this latter question, courts take into account the evidence presented to the prior jury, how the jury viewed that evidence, and the circumstances of that trial. *See* discussion, *infra.*

While Alvarez's habeas corpus petition was perjury-based, his Rule 33 motion is not. Nor need it be. Nothing in the test or history of the rule suggests that "newly discovered evidence" is limited to evidence of perjury. Accordingly, on this motion I subject the following evidence to Rule 33's three-part test:

1) Diaz's lie to a jury in the *Garcia* trial and his admission that he lied. *See Garcia* Tr. at 1177–78. Diaz stated in *Garcia* that he had used drugs in the past, "once or twice." *Id.* at 1177. He also denied that he used drugs on a weekly basis during the period that he was selling them. *Id.* When the defense attorney subsequently challenged these answers, Diaz revised his answers and said he had used drugs every other weekend, not once or twice:

Q. When you said "once or twice," is that because you didn't remember or because you didn't want to tell these ladies and gentlemen the truth?

A. Because I didn't want to tell these ladies and gentlemen that is the truth.

Q. So you are admitting now that you lied under oath to these ladies and gentlemen, isn't that right?

A. Just now—

Q. Yes or no?

A. Just now yes.

*Id.* at 1177–78;

2) Diaz's lie to an assistant United States Attorney and his admissions of the lie in the *Arango* Trial. *See Arango* Tr. at 281, 295–96. The lie concerned a particular person's involvement in a drug deal and whether he should be arrested by the government:

Q. You are on the scene in the streets, correct?

A. Yes.

Q. And you are being asked by a representative, a DEA officer, whether or not certain people were involved in a deal that you said just went down, is that correct?

A. Repeat the question, please.

Q. Yes. You were involved in your business?

A. Yes.

Q. Which is trying to find out about people who sell drugs, correct?

A. Right.

Q. And making a deal with them and then telling the cops, right?

A. Right.

Q. You made a deal and you hit the arrest signal and now the agents are there and they want to know who to arrest. Are you with me so far?

A. Yes.

Q. Okay. They ask you about somebody. They said what about this fellow, and you said no, not him, he didn't do anything, or words to that effect, right?

A. Yes.

Q. And that was a lie?

A. Yes.

Q. This fellow in fact had done something?

A. Right.

Q. And you lied about it?

A. Right.

Q. There [came] a later time when you had a conversation about this incident with an attorney in the United States Attorney's Office, correct?

A. Correct.

Q. And you told that attorney that the person that you had previously said had nothing to do with it did in fact have something to do with it, correct?

A. Correct.

Q. You explained that to that attorney, correct?

A. Correct.

Q. And that was by virtue of what you are saying now truthful, right?

A. Yes.

Q. But you lied to the U.S. Attorney about whether this person had been arrested, is that correct?

A. I told the attorney that the person wasn't arrested.

. . . .

Q. And you were ... questioned about this incident by [Assistant United States Attorney] Ms. Morey on behalf of the United States government?

A. Right.

Q. And you lied to her, right? Did you not tell her that the person was never arrested?

A. I did.

Q. Pardon me?

A. I lied, you know, a little bit.

Q. Just a little lie?

A. Yes.

*Id.* at 280–81, 296;

3) Diaz's lies to DEA agents and his admission of the lies in the *Batista, Garcia,* and *Arango* trials, *see Batista* Tr. at 106; *Garcia* Tr. at 1104, 1158; *Arango* Tr. at 197, 281.

In *Batista,* Diaz lied about his prior record:

Q. And you are telling me that they didn't know about this [state case for selling crack cocaine]?

A. I hadn't told them anything about this. They found out about this case when I was in jail. In other words, I was hiding it from them.

Q. Didn't they ask you if when you signed this cooperation agreement—

A. When I had—

Q. Let me finish the question. When you signed this cooperation agreement were you not debriefed, were you not spoken to by either Hunt or other members of the DEA office and didn't they ask you if you had a case pending?

A. Again, I say, yes, they asked me but I was scared at the time so I lied, I hid that from them.

*Batista* Tr. at 106.

In *Garcia,* Diaz admitted a similar lie:

Q. Did the DEA—excuse me. When you first began cooperating with the DEA, they asked you about your background, what you had done of a criminal nature, right?

A. Not really.

Q. They didn't?

A. No.

Q. They asked you if you had ever been arrested, didn't they?

A. Yes.

Q. And you lied to them, didn't you?

A. Yes.

Q. And did anyone ever inform you that it is a crime, a federal crime, to lie to a federal officer who was asking the official questions even if you are not under oath; did anybody ever tell you this?

A. No.

Q. Did anybody ever prosecute you for making a false statement to a federal agent?

A. No.

*Garcia* Tr. at 1104–05.

Diaz was also questioned about this later in the same trial:

Q. Well, before you started cooperating, before you started talking to [the DEA], they told you, "look, buddy, you're in big trouble," isn't that right?

A. Yes.

Q. "And you'd better tell us the truth and you'd better answer our questions truthfully," didn't they say that to you?

A. Yes.

Q. And after they told you you'd better answer our questions truthfully, you lied to them, isn't that right?

A. Yes.

Q. And you lied to them because it wasn't to your advantage at that point in time to tell them the truth, isn't that right?

A. Correct.

*Id.* at 1158.

In the *Arango* trial, Diaz lied about the same subject of his lie to the Assistant United States Attorney. *See Arango* Tr. at 280–81; discussion, *supra.* He also lied about his prior record:

Q. When [the DEA agents] arrested you in December of 1987, you didn't mention [your arrest for selling crack cocaine] to [the DEA agents]?

A. Right.

Q. They specifically asked you, didn't they, if you had ever been arrested?

A. Right.

Q. And you didn't tell them about this case?

A. Right.

Q. The reason you didn't tell them that was you didn't think they would give you

as good a deal if they knew about that case?.

A. I was just scared, you know, of the whole thing. You know, I was frightened. I just didn't want to go to jail.

Q. Right. So you lied to them?

A. Yes.

*Arango* Tr. at 196–97;

4) Diaz's conflicting testimony regarding the amount of time he dealt in drugs before working with the DEA;[11]

5) The testimony of Diaz and Hunt in the *Huascar Lara* suppression hearing; and

6) The information presently under seal concerning the credibility of Diaz and Hunt.

### *Prong #1—Due Diligence*

■ The record is clear that due diligence would not have helped Alvarez discover this evidence before or during trial. Each piece of new evidence concerned events occurring after trial. Alvarez therefore easily meets the first prong of the test.

### *Prong #2—Merely Cumulative or Impeaching*

■ The second prong is another matter. Although *Mesarosh* did not involve a Rule 33 motion, the Supreme Court explained its holding by referring to that Rule. It stated that, ordinarily, motions under Rule 33 involving newly discovered evidence are unsuccessful because:

> new evidence "which is merely cumulative or impeaching" is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial.

**11.** While this testimony may not have been perjurious, *see* discussion, *supra* at p. 1085, it is newly discovered evidence that may be used to impeach Diaz's credibility.

**12.** Although these cases do not specifically address Rule 33, each involves newly discovered evidence that goes to credibility. They therefore stand for the proposition that new evidence affecting credibility should not be rejected automatically as "merely cumulative" or "merely impeaching."

352 U.S. at 9, 77 S.Ct. at 5 (footnote omitted). Courts have repeatedly referred to this principle.

For example, the Second Circuit has, in denying such motions, characterized newly discovered evidence as. "merely additional evidence tending to undermine the credibility of [the witness] for reasons already before the jury," *United States v. Petrillo,* 821 F.2d 85, 89 (2d Cir.1987); "the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial," *United States v. White,* 972 F.2d at 22; "somewhat redundant since [the witness'] credibility had in fact been attacked repeatedly," *United States v. Diaz,* 922 F.2d at 1007; and "merely *additional* evidence tending *further* to impeach the credibility of a witness whose character had already been shown to be questionable," *United States v. Gilbert,* 668 F.2d at 96 (quoting *United States v. Rosner,* 516 F.2d at 273–74 (emphasis in original)).

But the Supreme Court and the Second Circuit have also recognized that a defendant's fate may rest on the jury's credibility determination. "The jury's estimate of the truthfulness and reliability of a given witness may be determinative of guilt or innocence." *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959) (*quoted in Wallach I,* 935 F.2d at 458 and *United States v. Seijo,* 514 F.2d 1357, 1364 (2d Cir.1975), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977)). Thus in rare cases new evidence may not be "merely cumulative or impeaching," but critical.

The Second Circuit acknowledged this in *United States v. Seijo,* 514 F.2d at 1363, *United States v. Stofsky,* 527 F.2d at 246 and *Wallach I,* 935 F.2d at 457–59.[12] In

For an eloquent and explicit statement of why this proposition applies in the Rule 33 context, see Judge Posner's decision for the Seventh Circuit Court of Appeals in *United States v. Taglia,* 922 F.2d 413, 415 (7th Cir.1991), *cert. denied,* — U.S. ——, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991). In that case Judge Posner criticized the rigid practice of trivializing newly discovered evidence as "merely impeaching":

> The government defends the judge's ruling on the ground that newly discovered evidence that is merely impeaching is not permissible

*Seijo* the Court held that the newly discovered evidence:

> cannot be said to constitute merely cumulative impeaching material.
>
> . . . .
>
> . . . [W]e are persuaded that despite the presence of other impeaching material available to the jury, [the witness'] prior conviction and his false concealment of this fact, had it been known to the jury, would have exerted a compelling impact on his credibility as to the unsubstantiated aspects of his testimony.

514 F.2d at 1363–64. While the *Stofsky* Court held that evidence of a witness' perjury on a collateral matter may only affect credibility, the Court also observed that credibility can be everything:

> [S]hould we, in determining whether truthful testimony by the witness would probably have changed the jury's verdict, also assume that the jury would have known that he had lied under oath about the matter? Since the witness's credibility could very well have been a factor of central importance to the jury, indeed every bit as important as the factual elements of the crime itself, we would answer in the affirmative. Upon discovery of previous trial perjury by a government witness, the court should decide whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly-discovered evidence not only upon the factual elements of the government's

case but also upon the credibility of the government's witness.

527 F.2d at 246. The *Wallach I* Court cited both of these cases and quoted them extensively. *See Wallach I,* 935 F.2d at 458–59.

In the case at bar, Diaz was subjected to vigorous cross-examination. Counsel for Alvarez attacked his credibility on cross and in his closing statement to the jury. Counsel urged the jury to disbelieve the testimony of the former drug dealer, Diaz, and believe the testimony of the defendant, Alvarez. The jury evidently believed Diaz.

While other testimony may have assisted the jury in its search for the truth about the conversation between the CI and the defendant, there is no denying that, ultimately, the case was a "swearing contest" as to who was telling the truth and who was telling the lie—Alvarez or Diaz. "The jury was squarely faced with the hard question of whom to believe." *Seijo,* 514 F.2d at 1364. Given the importance of this single credibility determination, I hold that the newly discovered evidence of—*inter alia*—Diaz's later lies, is vital impeachment material and not "merely cumulative."

My conclusion is bolstered by the importance of Agent Hunt's testimony at trial, the absence of any substantial cross-examination of him,[13] and the evidence under seal concerning his credibility. Although only Alvarez and Diaz could testify about the nature of their conversation and their conversation was the only evidence tying Alvarez to the conspiracy, Hunt's testimony contradicted Alvarez's in one significant re-

---

ground for a new trial. There is language to this effect in countless cases . . . but we do not think it can be taken at face value. Nothing in the text or history of Rule 33, or of the cognate civil rule (Rule 60(b)), supports a categorical distinction between types of evidence; and we cannot see the sense of such a distinction. If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted. The "interest in justice," the operative term in Rule 33, would require no less—as district judges have recognized in granting new trials in such cases.

Of course it will be the rare case in which impeaching evidence warrants a new trial, because ordinarily such evidence will cast doubt at most on the testimony of only one of the witnesses. . . .

*United States v. Taglia,* 922 F.2d 413, 415 (7th Cir.) (citations omitted), *cert. denied,* — U.S. ——, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991).

**13.** The government claims that both Alvarez and Hunt were "cross-examined vigorously," unsealed letter of April 23, 1992, but with respect to Hunt, a review of the transcript belies this description. The cross examination was more passive than vigorous, as its length suggests: cross-examination by Alvarez' counsel composes only seven of the trial transcript's 642 pages. *See Alvarez* Tr. at 150–56.

spect: whether Alvarez and Diaz went to the grocery store together. Hunt testified that he watched the two of them leave the apartment and walk to Diaz's car, but that they never entered the grocery store. Alvarez testified that they did enter the store. The defendant's account of an uneventful conversation and purchase of juice could not be believed if the jury accepted Hunt's testimony.

Alvarez's version may also have been discounted because of one other piece of testimony provided by Hunt: that he found $8,500 on top of the dresser in Alvarez's bedroom. That evidence clearly suggests Alvarez's role in the drug conspiracy; but it is flatly contradicted by Galan.

The new evidence is therefore material because it not only raises questions about the credibility of the Confidential Informant, but also about the corroborating government agent.[14]

Indeed, the prosecutor was well aware that Hunt's testimony could play a crucial role in the jury's deliberations. In her summations, she emphasized Hunt's credibility:

> Special Agent Hunt would have no reason to lie about what he saw and what he observed. He had no reason to shade the truth. If he saw him stopping at the grocery store there is no reason to say he didn't, and if he did not stop there there was no reason to say he did.
>
> The group 33 conspiracy makes no sense....

*Alvarez* Tr. at 521.

Given the nature of the evidence that was presented at trial against Alvarez, and the new impeaching evidence involving both Hunt and Diaz, I conclude that Alvarez meets the second prong of the Rule 33 test.

*Prong # 3—Probability of Acquittal*

■ The probability-of-acquittal prong is the most difficult for the defendant to meet, and the most difficult for a court to evaluate. It requires looking backwards and forwards:

> In passing on this test the court must evaluate the new evidence, not just in and of itself on a unit or cumulative basis, but in the light of the entire record made at the trial and on the motion. The strength of the evidence presented at the trial is an important consideration. If, measured by these criteria, the court thinks that there is a reasonable probability of an acquittal, and the other tests have been satisfied, a new trial will be ordered. Otherwise it will be denied.

Wright, *Federal Practice and Procedure*, § 557 at 323–24 (footnotes omitted).

At trial the government's only direct evidence against Alvarez came in the form of two comments he allegedly made to Diaz and which Diaz testified about on direct examination. The first comment was that "we ain't kids ... As long as you got the money, it's [the drugs] going to be there." *Alvarez* Tr. at 53. The second comment was "look, this is the first time you are buying from us. Today we sold more kilos than we ever sold any other day...." *Id.* at 54. Corroborating testimony came in the form of Hunt's testimony that Alvarez and Diaz did not stop at the grocery store. Circumstantial evidence was Alvarez's presence in the apartment that night, Hunt's testimony that he found approximately $8,500 on top of a dresser in Alvarez's room, Alvarez's employment and living relationship with Galan, and the fact that Galan gave testimony not entirely consistent with Alvarez's.

None of the witnesses, however, testified that Alvarez was in the kitchen while the drugs were disclosed to Diaz. No one tes-

**14.** This conclusion is also supported by the Second Circuit's discussion in *Wallach I.* In the Wallach trial, the government had relied on two primary witnesses, Mario Moreno and Anthony Guariglia. Because Moreno had perjured himself in a prior proceeding, the jury was instructed to evaluate his testimony carefully. No such instruction was given relative to Guariglia's tes-

timony. When it was later disclosed that Guariglia had also committed perjury, the Court of Appeals ordered a new trial, reasoning that evidence about the credibility of one witness could have changed the jury's credibility determination as to both witnesses. *See Wallach I,* 935 F.2d at 455–59.

tified that Alvarez was with the other defendants as they met in parts of Manhattan and arranged the drug sale. No one testified that Alvarez had ever been seen with drugs. No one testified that Alvarez possessed thousands of dollars.

Galan testified that there were only two pieces of furniture in the room where Alvarez stayed—a bed and a desk. Galan also testified that $13,500 was in that desk on the night of February 28, 1989. Not $8,500 and not *on top* of the desk, but locked inside.

None of the witnesses disputed Alvarez's testimony that he had been a guest in Galan's home for 28 days prior to the evening in question. No one disputed Alvarez's testimony that Galan was his employer. Assuming the truth of this unrebutted testimony, then, it may not be surprising that Alvarez did not object when his boss and host instructed him to accompany Diaz outside the apartment. Alvarez's undisputed testimony about his whereabouts earlier in the evening further undermines the government's case: while his co-defendants were driving from one place to another in preparation for the cocaine transaction, Alvarez was on 42nd Street watching videos.

The jury did not deliver its verdict until almost ten hours had elapsed; until it had heard read-backs on all the testimony related to Alvarez's involvement in the drug conspiracy; and until it had received numerous clarifying instructions from the Court. Other trial circumstances, described in detail *supra* at pages 1079–1080, were less than ideal.

At a second trial skilled counsel could use the new evidence to dramatic effect. She could tell the jury—through cross-examination and summation—that Diaz has lied to an Assistant United States Attorney, to a DEA agent, and to a judge and jury. If Diaz has lied to those people before, why not lie to this jury in this trial, in front of this judge, in front of this Assistant United States Attorney, and in front of this DEA agent?

As for the material from the *Huascar Lara* hearing, counsel could ask both Hunt and Diaz about lying under oath. The Second Circuit's broadly stated rationale in *United States v. Bagaric*, 706 F.2d 42, 65 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983), points in that direction, as does the *Bagaric* Court's citation at 65 to *United States v. Terry*, 702 F.2d 299, 316 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

The government observes that the sealed material provides no impeachment material because of Federal Rule of Evidence 608(b).[15] It is true that the sealed material does not contain evidence of perjury convictions against either Diaz or Hunt, and Rule 608(b) prohibits credibility attacks from being proved by extrinsic evidence unless the witness has been convicted of a crime.

But the rule does permit inquiry into such matters if 1) the matters are probative as to truthfulness or untruthfulness; and 2) counsel has a good faith basis for the inquiry. This would permit counsel to conduct a significant cross-examination of Agent Hunt as well as of Diaz. While the government argues that the material under seal "has no bearing on credibility," Government Brief of November 4, 1992 at 8, I disagree. Accusations (a), (c), and (e) involve dishonesty of a sort relevant to truthfulness. *See generally* 3 *Weinstein's Evidence* (1992) at 608–46.

Given the significance of the new evidence, I would prefer to specify here the permissible questions at a new trial. However, the materials are under seal and I will not unseal them by disclosing their contents in this opinion. Suffice it to say then, that *inter alia*, counsel could inquire as to whether Agent Hunt and CI Diaz are still employed by the government and whether

---

15. Rule 608(b), Fed.R.Evid., states in pertinent part:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....

they continue to testify as government witnesses on a regular basis; whether their government supervisors leveled charges against them with respect to several instances of misconduct; and whether the government believes they are credible witnesses.[16] The impact of cross-examination including this material is therefore likely to be substantial—particularly in comparison to the cross-examinations at the previous trial.

\* \* \*

"[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs*, 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976). In the case at bar, Alvarez could not have been convicted without the testimony of Diaz. There was not "ample independent evidence of guilt." *United States v. Gilbert*, 668 F.2d at 96. While Alvarez could have been convicted without the testimony of Hunt, Hunt's testimony was undoubtedly crucial.

A judge, not unlike a jury, can be certain of little. I do not know and cannot know what the decisive factor was in the jury's decision to convict Alvarez of conspiracy and possession with intent to distribute narcotics. Nor do I nor can I know what would happen at a new trial where the newly discovered evidence would be presented. But given the evidence presented at the previous trial and the evidence available at a future trial, it is my judgment that a jury would probably acquit the defendant of the crimes for which he was convicted.[17]

In making this determination, I am mindful that my conclusion is not only about process, but also about guilt and innocence. As the Second Circuit held in the Rule 33 context in *Sanchez:*

> There must be a real concern that an innocent person may have been convicted. It is only when it appears that an injustice has been done that there is a need for a new trial "in the interest of justice."

969 F.2d at 1415.

I think that Wilfredo Mejia Alvarez may be innocent. As another court held upon evidence of a witness' criminal conviction, in view of the lack of corroboration and the absence of eye witnesses:

> It was a case where the jury had to determine whether to believe the word of the defendant. To be sure defendant's account of the incident strains credulity, but the complaining witness' account is lacking in certitude in several respects; and this condition of the evidence, plus a showing that each had criminal records, which weighs heavily in connection with credibility, could well produce a state of mind that neither the complainant nor the defendant was telling the truth, that the full truth had not been told by either, and therefore the Government had not established guilt beyond a reasonable doubt.

*United States v. Gordon*, 246 F.Supp. 522, 525 (D.Col.1965).

Having considered the evidence as it existed at Alvarez's trial and considered the impact the new evidence would have at a

---

**16.** While defense counsel would be bound by the witness' answers under Rule 608(b), the government could not sit idly by if the witnesses testify falsely and the government knows it. That is because the government is obligated to correct statements of its own witnesses it knows to be false. *See Napue v. Illinois,* 360 U.S. 264, 269–70, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *Taylor v. Lombard,* 606 F.2d 371, 375 (2d Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980). Thus, if Hunt and Diaz were to testify untruthfully about investigations mounted against them or about their current employment status as government witnesses, the government would be required to reveal the truth to the jury.

**17.** By this conclusion I do not suggest that the previous verdict was illegitimate or that the trial was unfair. As the Second Circuit held in *United States v. Wallach,* 979 F.2d 912 (2d Cir.1992) (*Wallach II*), at 917, commenting on its decision to order a new trial in *Wallach I,* "[this] is not a ruling that the evidence presented was insufficient to permit a rational jury to find guilt beyond a reasonable doubt." It is, however, a ruling that the difference between guilt and reasonable doubt could not have been very much—and at least not as much as the increase in doubt raised by the new evidence.

second trial, I hold that Alvarez meets the third prong of the Rule 33 test. His motion for a new trial is therefore granted.

## CONCLUSION

For the reasons stated in an opinion to be issued forthwith, the petitioner's first habeas corpus petition is denied. For the reasons stated above, the petitioner's second habeas corpus petition is denied, and his motion for a new trial is granted.

The parties are directed to attend a conference at 10:00 a.m. on December 18, 1992, in Room 307 of the United States Courthouse. Defendant's bail application will be heard at that time.

It is SO ORDERED.